Good morning everyone. Well, this is a special morning because we are honored and privileged to have Judge Kennelly. It's my honor and my privilege. It's my honor and my privilege. Okay, well you're the head of the panel. It's our honor, sitting with us this morning. So you're all in for a treat and we're in for a rest. Come on up. We'll call the first case. Number 13-1552 and it's Wright v. Illinois Department of Children and Family Services. Good morning Mr. Baker. Morning Your Honor. May it please the court, my name is James Baker. I'm appearing this to me for my opening presentation. I would like to focus on issues raised in Ms. Wright's appeal. Ms. Wright, in her second trial before the District Court, which focused only upon the issue of whether she was a victim of a constructive discharge, the District Court granted the Department of Children and Family Services judgment as a matter of law at the close of her case, essentially reasoning that she did not present sufficient evidence that her working conditions were intolerable. As this court is aware, it has established two paths for a plaintiff to prove constructive discharge. The first path is when an employer makes the employee's working conditions sufficiently intolerable that resignation would be a reasonable response. The second path is when the employer communicates to the employee evidence that would reasonably indicate to her that she is about to be fired. Now this court has indicated in the second path there has to be some evidence of intolerability and the question really in this appeal is what does intolerability mean in the second path and did Ms. Wright have sufficient evidence of intolerability to get the case to a jury? So do you read the cases as saying that intolerability is something extra beyond they're about to be fired or that the fact that the person is about to be let go constitutes the intolerability? It's the second. If the employee reasonably believes, based upon the employer's conduct, that her has satisfied the second path to a constructive discharge. What evidence was presented that her working conditions were intolerable? What do you see as that evidence? With respect to intolerability under the second path, I think there are several pieces of evidence, most of which are noted in our brief. The first is that it was a practice of the department when an employee refused to submit to an IME to give them initially a 15-day suspension and if they continued to refuse the second discipline would be a discharge. That was communicated to the deputy director of the department who essentially oversaw the assessment of discipline against Ms. Wright, Mr. Chasey. He acknowledged that was the case and in fact in August he informed one of Ms. Wright's supervisors that she would probably be suspended pending termination in September. The second piece of evidence is that Ms. Wright did receive... What is intolerable about learning what the procedure is? That is background evidence to show that it was the intent of the department on the second refusal to go to the IME to discharge Ms. Wright. In the wake of that, what we have is that Ms. Wright, when she refused to go to the first IME, was immediately given a 15-day suspension. At about the same time she was given a 15-day suspension, she was noticed to go to the second IME and the notice indicated it was a second and final notice to go to the IME. And Mr. Wessel, the individual who drafted it, indicated it was typically the practice of the department to terminate an employee for insubordination on the second refusal and he wanted to impress upon Ms. Wright the importance and the consequences of her not going to the second IME. Well, what's intolerable about that? Well, the intolerability under the second prong, Your Honor, is that the employer has engaged in conduct which would reasonably communicate to the employee that she was about to be terminated. It's a different type of intolerability in our view than what's required in the first path to constructive discharge. I mean, I guess I sort of get those cases as saying if you get from the employer that, you know, it's a done deal and you're gone, you're entitled to say you can't fire me, I quit. But she had a union contract, right? She was. So she could have challenged all this through collective bargaining and grievances and that kind of thing? No. Why not? By the time she resigned, all the steps pre-leading to her discipline had been completed. She had been given her watermill hearing. She was awaiting a decision from the department on what her discipline would be. She had no right to grieve anything relating to her refusal to go to the second until discipline was assessed against her. Well, fair enough. But then she would have been able to challenge it then? After she was terminated. Sure. And Judge Mim noted that distinction in his opinion. He indicated that there is a difference between the cases where an employee had a right to a hearing before the discharge decision was made. For example, police merit commission cases where the merit commission rather than the employer assesses the discipline. In this case, the discipline could be assessed by the department. Any remedies Ms. Wright had to challenge the discipline through either arbitration or the civil service commission would have been after the discipline was assessed. Was there work that she could have done while on desk duty? Yes. Or was she not? In other words, did she ever request that work be assigned to her? She was told when she was placed on desk duty that she would be assigned no work. While on desk duty she could not work on her own cases, she could not go out in the field or make contact with clients, but there was a lot of paperwork she could do to assist other case workers. And did she? She was never given that work. She was told she would be given no work to do. So Judge Mim seemed to be saying towards the end of his decision that she made a choice because she kind of figured out the retirement formula would work better if she quit earlier. What's that all about? Well, Judge Mim seemed to suggest that because she looked into her retirement options, her decision was voluntary. I think the evidence would be that was a reasonable response on her part to the conduct of the department and at least indicating that she was about to be fired. At the time she did that, several things had happened. First, all the discipline had been completed. All the discipline process had been completed. This was not a situation where the path leading to discipline was beginning. It was not lurking in the background. It was there. The second thing that occurred is that she received a notice from the Department of Central Management Services that she would be responsible for her health insurance premium for the month of September. Now the month of September, she was scheduled to work. Normally health insurance premiums would be taken out of her paycheck. If she had to pay the premiums, it meant she wasn't getting a paycheck. The notice that she got from CMS indicated that the reason for it was, I think the term was, suspension greater than 30 days. In the state of Illinois, there is a process called suspension pending discharge, which essentially means if your discipline is a termination or discipline greater than 30 days, her employer suspends her waiting approval to discharge from the Department of Central Management Service, which is typically received. What was the difference in the retirement payments that were available to Ms. Wright based on the date she actually retired as opposed to the date that she had planned to retire? I apologize. I can't recall the precise amount. However, at the time of the first trial, the Department and Ms. Wright entered into a stipulation that had that calculation. My recollection is it was somewhere between $200 and $300 a month, but I may be mistaken on that point. We believe- You know, one thing that is so clear from these briefs is that the parties have set forth starkly different versions of what transpired. So- I agree. Help us with that. Well, I think in this case, the evidence is, and it was sufficient for a jury to decide that the department had concluded it was going to terminate Ms. Wright. All the process for discipline had been completed, awaiting only a decision as to what the discipline would be. And in this case, the department and Ms. Wright agreed that the evidence that was presented in the second trial essentially duplicated what was presented in the first trial. And in the first trial, a jury, after hearing that evidence, answered in the affirmative a special interrogatory finding that Wright was the victim of a constructive discharge. And in his post-trial order, granting the department a new trial because of a jury instruction issue, Judge Min indicated that he believed there was sufficient evidence to enable a jury to conclude that her discharge was imminent. So there really wasn't anything different in the evidence at Trial 1 versus Trial 2? We don't believe so, and the department in its brief essentially didn't either. So here we have kind of, we don't have to speculate about what a jury would do when it heard the evidence. The jury, in fact, heard the evidence the first time and found that there was a constructive discharge. I'd like to speak for a moment on the jury instruction question. Before you do that, perhaps you can help us with this. She was assigned to desk duty, but it doesn't appear that she attempted to seek any meaningful work because she chose to essentially forego coming to the office through the use of her vacation time and sick leave. So how do we deal with all of that? I don't think it's necessary to deal with it, Your Honor. If the evidence is, if there is sufficient evidence to believe that the department reasonably communicated to Ms. Wright that she would be discharged, what she did or did not do on desk duty and the circumstances for what she did or did not do is kind of irrelevant. Well, not irrelevant to intolerability. I believe, with all due respect, Your Honor, I believe it is for this reason. If the evidence suggests that Ms. Wright was about to be discharged and she resigned in the wake of the discharge decision, that satisfies the second prong in our view. And I would refer the court, I see my light is on, I would refer the court to the Chapin case, and I cite that because it's the most recent case. The court in that case recognized that when an employer acts in a manner so as to communicate it to a reasonable employer that she will be terminated, her working conditions are intolerable. It went on to note that working conditions do not become intolerable merely because a process of discharge lurks in the background. In other words, it has to be imminent. And the Chapin court said in finding against the plaintiff that even construing all the evidence in Chapin's favor, no reasonable employee standing in Chapin's shoes would believe that had he not resigned, he would have been immediately fired. Unlike the University of Chicago hospitals, there's nothing to indicate that a firing here was imminent and an inevitable event. This is not a situation where the handwriting was on the wall and the plaintiff quit just ahead of the ax. We submit in this case the facts are that the handwriting was on the wall and the ax was about to fall. I see my light is on. Unless the court has any other questions, I would like to reserve the rest of my time. Ms. Wickern. Good morning, Your Honors. Nadine Wickern, Assistant Attorney General on behalf of the Department of Children and Family Services. I'm going to start this morning talking about the fitness for duty evaluation issue. And that is because it's a predicate to the constructive discharge issue. In other words, if this court finds that the department should have been granted judgment as a matter of law to the department on this issue, then there's no need for it to reach the constructive discharge issue. Wright agrees that it was a matter of business necessity for the department to determine whether it's caseworkers who work directly with children who have been abused and neglected to be mentally fit to perform those duties. You see, you've argued that the court erred in failing to grant judgment as a matter of law on the fitness for duty claim. But given that Ms. Wright was allowed to continue to work with children after the evaluation was ordered, and that the psychiatrist's letter recommending the evaluation was solicited by her supervisors, isn't there enough evidence that there was no real concern for her mental health for this to go to the jury? I think it depends on how this court comes down on what the legal standard is. There's not many cases in this area. But what has become clear in this court's few cases and the other circuits is that this is an objective test. So whether Bullock and Foster did everything perfectly doesn't mean that there was not a business necessity for this evaluation to be ordered. In other words, based on the evidence viewed objectively, a reasonable employer would have a legitimate concern enough to order an evaluation, particularly given the special work environment that has been recognized in this court's decision in Kaufman and other circuits. But the fact that it's objective, that doesn't mean you can't consider what they actually did. What they actually did is they let her keep working. Well, if this court views the standard more akin to like the Fourth Amendment probable cause standard where the subjective motivations of the actors are irrelevant, as long as there's enough objective evidence to rely on to order the evaluation, then I would say that that evidence is not legally relevant, or at least here did not overcome the objective evidence that would support the ordering of the evaluation. You know, based on the plain language of the statute, all that's required is that there be a business necessity and that the evaluation be job related. So you're saying you can't consider what the employer actually did in deciding whether there's business necessity? Just like in that Fourth Amendment context, what actually happened, but the relevant legal question is whether there was an objective basis for an employer to have a legitimate concern. Okay, but if you can consider what they actually did, then why isn't Judge Rovner right that there's enough facts there that you had to have a trial about it? I mean, in that Fourth Amendment comparable standard, there can be situations where there's so much evidence, you know, of the subjective nature that a reasonable jury can conclude that no reasonable person would have arrested the person for what they'd done. But here, there was enough objective evidence such that no reasonable jury could find otherwise. And let me just spell that out. First, Dr. Costa issued an unsolicited order that might not have any contact with this minor. And as Bullock and Foster testified, that was very unusual. They had never seen a doctor issue such an order to one of their caseworkers, and they even contacted their legal department to find out if such an order could be issued to them. So this was a highly unusual situation where a third party, a psychiatrist, issued a no-contact order. Second, there was a hearing, a juvenile court hearing, where people from the department and those at Rice testified about some of the actions that Wright took under oath. And so the department was entitled to rely on that evidence in determining whether to issue this evaluation order. Third, Dr. Costa sent a letter to the department spelling out why he issued the no-contact order. So even if that letter was solicited by the department to have evidence for why that order was issued, that doesn't mean the department was wrong to rely on what was in that order. And the fact that Wright can pick apart and dispute every incident, the department was not obligated to believe her. It had a legitimate basis to order the evaluation based on that evidence alone. For a third party psychiatrist to evaluate her and inform the department whether she could continue working in the capacity she currently was, whether she would be better suited to work in another capacity within the department, or whether her discharge was warranted. Based on the cases from the other circuits involving these kind of work situations, the department would be derelict. It had an obligation to determine, based on that objective evidence, whether Wright was fit for duty. It seemed the department would be derelict in letting her still work with children, though, while the order was extant, and they did. It's not a perfect situation, but that doesn't mean the evaluation... I mean, they needed to evaluate her to determine whether she should still be working with them. It doesn't call into question whether there was a business necessity for the examination? It could be evidence that there was not an objective basis, but there was here, under the evidence here. Why? Because there was evidence that Wright had undermined the treatment of this child, had boundary issues with this child, had informed this child that her mother terminated her parental rights, even though the treatment team had decided to wait to tell the child. There was definitely something going on between Wright and this child that caused the department... But you didn't think you had to take the employee away from the children at that point? They did remove her from working with this child, and as her supervisors testified... But not all children. And I think that is evidence that the department's actions were measured, instead of overreacting to the situation. And the supervisors testified that, in hindsight, they should have removed her from working on other cases, and they eventually did. But the fact that their actions were not perfect does not mean there was not a legitimate basis for them to order the evaluation of Ms. Wright. The imperfection here goes directly to the question of whether she should work with children, which was the whole point of the exam. Precisely. And there was enough evidence for them to order the evaluation, which was the issue. Whether they should have removed her sooner from working with other children, and a lot of these other concerns that Wright raises about whether CPL was a liar, whether the Wright staff lied to the department, those things don't undercut the fact that the department had a legitimate basis to order the evaluation. So at some point I want to ask you about that jury instruction. Can you explain to me the difference? As I understand it, the jury instruction said something along the lines of the plaintiff... What should it have said? If the second case had gone to the jury, what would the jury instruction appropriately have said? It might have looked more like the first part, where it said a reasonable person standing in the position of the employee would reasonably believe... So rather than the plaintiff reasonably believed, it should have said a reasonable person standing in the plaintiff's position would have believed. Right. Can you explain to me what the difference is? I mean, I understand that they don't say the same thing, but practically speaking, what is the difference? Well, one is kind of leaning towards the perspective of the employee, whether she reasonably believed that the situation was such that she was going to be discharged, versus sort of the more objective view. And the fact that they were different, I think, demonstrates that the jury would possibly be confused by that. But putting this into context, this issue about the jury instruction does not matter, because the department moved for judgment as a matter of law on the constructive discharge issue after the first trial, as well as for a new trial based on the jury instruction. So it should have been granted judgment as a matter of law, regardless of whether the instruction was correct or not. So the fact that the instruction might have been wrong is kind of irrelevant in this case. Well, it's irrelevant if you're right on the judgment as a matter of law. Correct, correct. So turning back to answer some of the things on the constructive discharge issue, you know, there... after Ms. Wright took early retirement, if she had stayed in the position, would she have been able to pursue a grievance as to the requirement for the evaluation while refusing to submit to the evaluation? And would that have been decided prior to any termination? Yes, she could have pursued the grievance challenging the evaluation, which she did. Whether it would have been decided before the discipline was decided is unclear. We would have to speculate as to that, and that's the problem. I want to clear up something. She had her pre-disciplinary hearing on September 5th. She did not know what the department's decision was going to be on the discipline before she retired. The department had 45 days from September 5th to decide what to do about her second defiance of the evaluation order. As the testimony showed, the department in the past had terminated someone after a second notice, but it also had given someone a third notice before. So it was possible we would have to speculate about what the department's decision was going to be. And on September 13th, when she decided to retire, on September 17th, when she informed the department that she was going to retire, and on September 30th, when she retired, it was unclear what the department's disciplinary decision was still going to be. That, plus the fact that after the department issues a notice to an employee that they're going to be suspended for 30 days pending discharge, that notice is sent to CMS, and CMS has a period of time in which to decide whether to uphold that discharge. So those steps still had to be taken, in addition to the fact that she had grievances pending to challenge these evaluations. The process was still underway. Sorry, Mr. Baker said that or argued that the grievance thing doesn't really matter because that would have been after the fact. Do you agree with that or disagree with that? We just don't know. The first grievance could have been before. Particularly if they had issued a third notice, that would have extended things even more. And the third notice was something you said they had done in another case before. Right. So there's a lot of things that are uncertain based on the trial evidence, which leads to the conclusion that a reasonable person in the situation would not believe that the ax was about to fall. In the cases that we discuss, the intolerable conditions means that the person has to show there's no hope for better treatment, and here we just don't know what would have happened. And so there's too much speculation that would have to go into deciding whether she was constructively discharged. Instead, she assumed that she was going to be discharged, and as soon as she found out that she could retire early, her and her husband did. And that was a voluntary choice on her part because prior to that, she was going to stay there and challenge the evaluation order or wait until she was discharged. So before learning that she could retire, she was content to let one of those two things happen. As this court noted in its decisions in Levenstein, Swearington, L., when a process is still underway, the plaintiff has to let that process play out before they can take the decision upon themselves to resign. And that's just what happened in this case. Wright knew that she had more procedures that she could exhaust, and it was not clear what the department's decision on her discipline was going to be. Unless the court has any further questions... The department would ask that it reverse the decision on the fitness for duty evaluation claim and thereby not having to determine whether she was constructively discharged or at a minimum uphold the decision to grant judgment as a matter of law to the department on that issue. Thank you. Six minutes. Mr. Baker, you have six minutes. Thank you. I'll talk fast. No, no, no. I'd like to address the ADA issue. There are two principles that are fairly clear from the limited case law concerning a business justification for a psychiatric or medical examination. The first is the burden is on the employer to show the justification. The second is that there must be... How do you think that the state has not done that? Well, there are a lot of ways that we recited in our brief, but I think the best way is there has to be substantial evidence that would lead a reasonable person to question the employee's fitness to work. And in this case, two individuals were requesting the IME. Mary Bullock, who was in Ms. Wright's chain of command, and Jill Foster, who was her immediate supervisor. It's a practice of the department when someone is summoned for a fitness for duty evaluation, particularly a psychiatric evaluation, to take them out of the workforce. In this case, Ms. Bullock, or Ms. Wright, excuse me, worked for the better part of 60 days. After being summoned for an IME where it was work as normal. She saw children, she made court appearances, she interacted with families. And the only reason that didn't continue was because a labor relations specialist named David Hoover found out she had not been removed from the workforce. And he sent what I think is the best argument that can be made to a jury. He sent an email saying, why in the world are we going through this process if she's still seeing children? What's the point? If she's seeing children, then she's got to be fit to work. And what's even more telling is Jill Foster's response. Now keep in mind, Ms. Foster was the supervisor that had the most contact with her. And Ms. Foster said, what's the point of putting her on desk duty? Her files are complete. And if we put her on desk duty, then her work has to fall on someone else. So I want to ask you about that jury instruction when you're finished with this point. Sure. I don't want to stop you from finishing. All right, just a couple other comments. The other thing is, Mary Bullock, who prepared the justification based largely upon incidents that were several years old, assigned Wright, after she directed the fitness for duty evaluation, to perform work on a very sensitive case which could require Ms. Wright to travel to the state of Mississippi to pick up an infant. Now a reasonable jury hearing just that evidence could say if her supervisors didn't believe she was unfit for work, and they clearly didn't by virtue of their conduct, we believe that the Department didn't make its justification. Okay, so now I'm going to butt in. I want to ask you about the jury instruction. So why wasn't the jury instruction wrong? In other words, the point Ms. Wickern was making is that the first jury instruction, the one that was given in the first trial, started from the wrong perspective. It started from the perspective of what the plaintiff thought rather than from the perspective of what a reasonable person would have thought. Actually, it doesn't. Judge Mim felt that too much emphasis was placed upon the employee's subjective belief. But if you look at the second prong, it says if the employee reasonably believes that her discharge is imminent, in other words, there are two magic words, the reasonable belief, and the discharge has to be imminent. You know, maybe it's a nuance though, but I guess I can see somewhat of a difference between those two things. In other words, if you start off from the perspective of did the plaintiff believe it and is it reasonable, that's maybe a nuanced difference from starting off from what an objective, outside person reasonably would have thought. I tend to disagree for this reason. The fact that it's a reasonable belief rather than a subjective belief, or no modification as to the type of belief, but if it's a reasonable belief, it has to come from some source. And that source necessarily has to be the conduct of the employer. An employee could not reasonably believe she was terminated unless the employer did something to communicate that belief. I would like to, and I guess in our brief we cite a number of other reasons to call into question the reason for the IME. Ms. Werchter made a couple of comments that I would like to at least respond to. The first comment is that I think she indicated that it would be speculative as to whether she would have been terminated. Obviously there was evidence that could go either way, but what we know is that Judge Mim in the first trial felt there was enough evidence to feel that Wright's discharge was imminent. And the jury, after hearing the evidence, concluded that she was the victim of a constructive discharge. So at least we have a map showing how a jury earlier reacted. The second point I would like to clear up is that the fact that Wright filed a grievance challenging the IME does not mean the IME would not have gone forward. It might take a year or more to resolve the grievance, and by the time the grievance was resolved, the IME would have been concluded. The last point I would like to make is, and I'm kind of being redundant here, there was nothing further to be done in the process of assessing discipline when Ms. Wright resigned. She had had her water mill hearing, the charges had been submitted to her, everything was awaiting a decision by the department. And while the department had up to 45 days, what we know is that with respect to the 15-day suspension, the discipline was assessed in a matter of several days after the water mill hearing. If the court has no further questions, I complete it. Thank you. Thank you, Mr. Baker, and thank you, Ms. Woodburn, very much. The case will be taken under advisement.